# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Deborah Clevenger, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21-CV-5889 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| A.M. Castle & Co., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the court on defendant's motion for summary judgment.

In August 2018, plaintiff Deborah Clevenger's husband was diagnosed with stage four pancreatic cancer.  Pl. Resp. Def.'s Stmt. Undisp. Mat. Facts ¶ 8, ECF No. 77 (hereinafter "Resp. to SUMF").  Her employer, defendant A.M. Castle & Co. ("Castle"), terminated her five months later on January 10, 2019, because she was allegedly failing to meet performance goals set a month earlier in a written performance improvement plan.  *See* Resp. to SUMF ¶ 2–6, 53, 66.  The database reports showing that Clevenger failed to meet her performance goals have not been produced to the court or to Clevenger, despite her repeated requests for them.

Clevenger filed this lawsuit under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, and the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq.*, contending that Castle terminated her, and retaliated against her, "due to unfounded fears" that she would be inattentive to her work as a result of her husband's illness.  Compl. ¶¶ 52–53, 62, ECF No. 1.  She also alleges that Castle interfered with her FMLA rights and retaliated against her by terminating her employment approximately three weeks before her one-year employment anniversary—she would have been eligible for FMLA leave after one year—in order to prevent her from using FMLA time to care for her husband once she became eligible.  *See* Compl. ¶¶ 71–73.  For the reasons discussed herein, the court denies summary judgment on Clevenger's ADA

claims, but because Clevenger did not communicate her intent to take FMLA time with sufficient clarity, the court enters summary judgment dismissing her FMLA claims.

## I. SUMMARY JUDGMENT STANDARD AND LOCAL RULE 56.1 FACT STATEMENTS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To show that a fact cannot be or is genuinely disputed, a party may cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); see also Fed. R. Civ. P. 56(c); N.D. Ill. LR 56.1. When a summary judgment motion is filed, "the court has one task and one task only: to decide . . . whether there is any material dispute of fact that requires a trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)); *see* Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, "facts must be viewed in the light most favorable to," and all reasonable inferences from the evidence must be drawn in favor of, the nonmoving party—but "only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation omitted). After a properly supported motion for summary judgment is made, the adverse party must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250 (quotation omitted). Thus, summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

2

**B. Local Rule 56.1 Fact Statements and Memoranda**

As required by this court's Local Rule (LR) 56.1, the parties have filed statements of undisputed material facts ("fact statements") and responses along with their memoranda of law. The LR 56.1 fact statements and responses serve as the court's "roadmap" to the evidence; they "are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994); *accord Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Consistent with this purpose, the Seventh Circuit has "routinely upheld the district court's discretion in requiring parties to comply strictly with [Local Rule 56.1's] requirements." *Curtis*, 807 F.3d at 219 (citing *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 630 (7th Cir. 2009)); *see e.g.*, *Igasaki v. Ill. Dep't of Fin. & Prof'l Reg.*, 988 F.3d 948, 956–57 (7th Cir. 2021).

Clevenger filed a sixty-paragraph LR 56.1(b)(3) statement of additional facts without seeking leave of court.[1] Local Rule 56.1(d)(5) limits the moving party's fact statement to eighty paragraphs and the non-moving party's statement of additional facts to forty paragraphs. Castle objects on this ground in its response to Clevenger's statement of additional facts, representing that it stipulated to Clevenger filing a fifty-paragraph statement of additional facts, but she exceeded the stipulated limit. *See* ECF No. 89 ¶¶ 51–60. The court appreciates the courtesy extended by counsel in entering into this stipulation, although the proper procedure in this circumstance was to file an agreed motion for leave to exceed the applicable paragraph limit. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); LR 56.1, Committee's Note. In its discretion, the court elects to abide by Castle's stipulation and therefore strikes paragraphs 51–60 of Clevenger's statement of additional facts. *See e.g.*, *Petty*, 754 F.3d at 420–21; *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 654–55 (7th Cir. 2011); *Donald v. City of*

---

1. Clevenger's statement of additional facts has two paragraphs numbered three, meaning that her statement of additional facts consists of sixty-one numbered paragraphs. *See* ECF No. 78 at 1–2. The court disregards only those paragraphs to which Castle specifically objected as exceeding the stipulated limit.

*Chicago*, 724 F. Supp. 3d 704, 706 (N.D. Ill. 2024), *appeal dismissed*, No. 24-1658, 2024 WL 4589253 (7th Cir. Oct. 3, 2024) (collecting cases declining to consider paragraphs in excess of the forty-paragraph limit).

In their legal memoranda, the parties mix direct citations to summary judgment evidence with citations to the LR 56.1 fact statements and responses. *E.g.*, ECF No. 88 at 5, 7; ECF No. 76 at 2–3. "The rule in this district that summary judgment memoranda must cite the Local Rule 56.1 fact statements is well settled and need not be belabored." *Palmer v. City of Markham*, 2023 WL 11960561, at *2 (N.D. Ill. Feb. 24, 2023) (quoting *Magee v. McDonald's Corp.*, 2019 WL 10447014, at *4 (N.D. Ill. Mar. 28, 2019)). Mixing direct citations to summary judgment evidence with citations to the LR 56.1 fact statements and responses frustrates the rule's purpose, making it very difficult for the opposing parties to respond and for the court to determine what facts are genuinely disputed. *Id.* (citation omitted); *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664–65 (N.D. Ill. 2015). The court disregards all direct citations to summary judgment evidence in the parties' legal memoranda.

A few more overarching issues: "Consistent with its ordinary practice, this court will not consider improper arguments in the LR 56.1 statements." *Spiegel v. EngageTel Inc.*, 372 F. Supp. 3d 672, 677 (N.D. Ill. 2019) (Gottschall, J.) (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); other citation omitted). "The court also disregards legal conclusions" in the parties' LR 56.1 fact statements and responses. *Id.* (citing *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012); other citation omitted). Finally, "To the extent necessary, the court addresses relevance and materiality issues as they arise, *infra*." *Id.* (citing *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1019 (N.D. Ill. 2018)).

## C. Evidentiary Objections

Having addressed overarching issues with the LR 56.1 memoranda and fact statements, the court turns to dispositive evidentiary objections raised in the parties' responses to the fact

statements. "In granting summary judgment, a district court may consider any evidence that would be admissible at trial." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (citing *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014)). Summary judgment evidence "need not be admissible in form, but must be admissible in content" at trial. *Id. (citing Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994)); *see also Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) (*citing Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)); Fed. R. Civ. P. 56(c).

Clevenger objects to several paragraphs of Castle's fact statement as "vague," by which she means that the underlying evidence is not specific about a material matter, such as the timeframe of an event or a matter referred to in the cited testimony. *See e.g.*, Resp. to SUMF ¶¶ 27–28, 37, 47–48, 50–52, 54–58. The court interprets these objections as arguing that any ambiguities in the evidence Clevenger cites, including as to timeframe, should be resolved in her favor. As it is required to do, the court resolves all such reasonable ambiguities in Clevenger's favor at summary judgment.

Next, Clevenger lodges "best evidence" objections to paragraphs 54 and 65. Resp. to SUMF ¶¶ 54, 65. Those paragraphs cite the transcript of the deposition of Russell Schommer, Clevenger's supervisor. *See id*. In the cited passages, Schommer testified to the contents of reports produced by Castle's computer-based Oracle database; the reports allegedly showed the weekly metrics used to evaluate Clevenger's performance and whether she was meeting her goals. *See* Schommer Dep. 93, 152, ECF No. 51-2. The database reports have not been made a part of the record. The parties have not told the court whether the reports were requested during discovery.

"The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description . . . ." *Gordon v. United States*, 344 U.S. 414, 421 n.14 (1953); *see generally* 2 *McCormick On Evid*. § 234 (9th ed. Westlaw database 2025). The best evidence rule provides, "An original writing, recording, or photograph is required in order to prove its content

unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. "If a witness's testimony is based on his first-hand knowledge of an event as opposed to his knowledge of the document, however, then Rule 1002 does not apply." *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648–49 (7th Cir. 2006) (citing *Simmons v. Allsteel, Inc.*, 1999 WL 1045214, at \*2 (N.D. Ill. Nov. 12, 1999)). "A computer printout of information stored on a computer is 'an original' for purposes of Fed.R.Evid. 1001(3) and 1002." *DirecTV, Inc. v. Reyes*, 2006 WL 533364, at \*7 (N.D. Ill. Mar. 1, 2006). Castle cites nothing in Schommer's deposition indicating that he had first-hand knowledge of the information in the Oracle database; rather, he based his testimony that Clevenger did not meet her performance goals solely on his review of, and therefore the contents of, daily and weekly reports produced by the Oracle software. *See* Schommer Dep. 93, 152. Consistent with the best evidence rule, an "event may be proved by nondocumentary evidence, even though a written record of it was made. If, however, the event is sought to be proved by the written record, the rule applies." Fed. R. Evid. 1002, Advisory Committee's Note.

The latter rule applies in the case at hand. Schommer does not testify to facts of which he has firsthand knowledge and which were also recorded in the Oracle database. Rather, Castle relies solely on Schommer's testimony to establish that Clevenger failed to meet weekly performance metrics, and Schommer simply repeated what the Oracle reports allegedly showed about Clevenger's performance metrics at his deposition. *See* Resp. to SUMF ¶ 54. Because Schommer had no firsthand knowledge of the facts contained in the reports, the court sustains Clevenger's objections to Schommer's testimony. *See Kenner v. Comm'r,* 445 F.2d 19, 22–23 (7th Cir. 1971)*; United States v. Rohalla,* 369 F.2d 220, 222–23 (7th Cir. 1966); *Biomet, Inc. v. Fields*, 2008 WL 5191496, at \*5–6 (N.D. Ind. Dec. 9, 2008); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007).

## II. FACTS

Consistent with the summary judgment standard, the court narrates the properly supported summary judgment facts in the light most favorable to Clevenger, resolving genuine disputes in her favor. *See Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 805 (7th Cir. 2020) (citation omitted). "Castle is [a] distribution company that provides metal materials to customers on a transactional basis." Resp. to SUMF ¶ 1. Clevenger has worked for the credit department of various companies for more than thirty-five years. Def.'s Resp. to Pl.'s LR 56.1(b)(3) Stmt. Add'l Facts ¶ 1, ECF No. 89 [hereinafter "Resp. to SAF"] (undisputed portion).

On February 1, 2018, Castle hired Clevenger as a credit representative on an at-will basis. Resp. to SUMF ¶¶ 2–4. Clevenger worked in Castle's credit department. *See* Resp. to SAF ¶ 1–10. Her duties required "collecting on past due accounts by, inter alia, calling past due accounts to try to get the customer to pay." Resp. to SUMF ¶ 38. Clevenger reported to Schommer, who in turn reported to Thomas Gries, Castle's Director of Finance. Resp. to SUMF ¶¶ 5–6. Erin Murphy, an employee in Castle's Human Resources department assigned to the credit department, was involved in many of the events reflected in the summary judgment record. *See* Resp. to SAF ¶ 15; Murphy Dep. 60:20–25, 63:13-64:10, ECF No. 51-3.

Castle "was involved in" a bankruptcy proceeding in 2018. Resp. to SAF ¶ 6. As a result, the credit department faced significant pressure to improve cash flow. *Id.* Schommer led a restructuring effort in October of that year intended to increase the department's performance. *See* Resp. to SAF ¶¶ 9–11. Schommer assigned Clevenger and another credit representative, Penny Peer, to work exclusively on collections of past due accounts receivable, with Clevenger being responsible for collections in Castle's eastern region and Peer for the western region. Resp. to SAF ¶ 11. The department's other two credit representatives worked on risk management, which "entails issuing credit limits to accounts, performing credit analysis and review and determining the release of orders that are put on hold by sales." Resp. to SAF ¶¶ 8, 11.

**A. Cancer Diagnosis and Remote Working Arrangement (Sept. 2018)**

Clevenger's husband was diagnosed with stage four pancreatic cancer in August 2018.

Resp. to SUMF ¶ 8. He began treatment the next month. Resp. to SUMF ¶ 9. Because his

prognosis was terminal, Clevenger did not know how long the treatments would last. Resp. to

SUMF ¶¶ 11–14, 17. Clevenger notified Castle of her husband's diagnosis on or about

September 5, 2018. Resp. to SAF ¶ 15. Castle argues that the evidence Clevenger cites does not

support this date, *see id.*, but an email from Murphy to Gries and Schommer confirms that all

three were aware of the diagnosis on that date. *See* email from Murphy to Schommer and Gries,

at 1 (Sept. 5, 2018, at 2:24 PM), Pl. Ex. 5 at 77, ECF No. 77-5. Murphy wrote that Clevenger

was ineligible to request FMLA leave "since she has not been here for one year," adding that

Clevenger "may need some time off and/or more flexibility" due to her husband's treatment. *Id*.

Reading Murphy's September 5, 2018, email message in context, a reasonable jury could find

that Murphy wrote it to follow up after a conversation about Clevenger's husband's illness,

during which Murphy, Gries, and Schommer discussed Clevenger's potential eligibility for

FMLA leave. *See id.*

Each week, Clevenger and her husband travelled to a medical facility in Zion, Illinois.

They stayed at the facility from Thursday to Sunday while Clevenger's husband underwent

treatment. *See* Resp. to SUMF ¶¶ 9–10. When she advised Castle of her husband's illness,

Clevenger suggested working remotely from the treatment facility on Thursdays and Fridays.

Resp. to SUMF ¶ 19. Castle had no formal remote work policy at the time. Resp. to

SUMF ¶ 20. Schommer approved Clevenger's remote work proposal, and she worked remotely

on Thursdays and Fridays in September and October 2018, with the exception of October 30

discussed below. *See* Resp. to SUMF ¶ 18

Clevenger testified at her deposition that Schommer's "whole approach" toward her

changed after she told him about her husband's diagnosis. Clevenger Dep. 223, Def. Ex. 1, ECF

No. 51-1; Resp. to SAF ¶ 35. Over the ensuing month (the precise timeframe is somewhat

unclear from Clevenger's testimony), Schommer became "abrupt" and exhibited increasing

hostility toward her in what she described as a gradual process. *See* Clevenger Dep. 223 ("it started out as subtle changes, and then they just kind of grew as time went by."). Before she told Castle about her husband's illness, it is undisputed that "no alleged customer complaint issues [about Clevenger] came up." Resp. to SAF ¶ 26. Schommer attempted to cancel Clevenger's remote working arrangement on two occasions. *See* Resp. to SUMF ¶¶ 22.

**B. First Attempt to Cancel Remote Working Arrangement (Sept. 28–early Oct. 2018)**

On or about Friday, September 28, 2018, Schommer emailed Murphy to say that Clevenger's remote working arrangement had "begun to impact customers and the branches," and he wanted to cancel her remote working arrangement. Pl. Ex. 5 at 76 (message sent at 2:48 PM). He noted that Clevenger had relatively little paid time off (PTO) remaining and asked, "Can she take unpaid time off? Do we transition to a pseudo FMLA concept . . . ?" *Id.* at 77. When asked at his deposition, Schommer could not recall any specific customer complaints raised in September 2018. Resp. to SAF ¶ 17 (citing Schommer Dep. 43–44) (undisputed). The parties cite no evidence documenting any customer complaints in September 2018.

Murphy replied to Schommer the following Monday morning. Email from Murphy to Schommer (Oct. 1, 2018, at 8:34 AM), Pl. Ex. 5 at 76. Murphy reiterated that Clevenger was "not eligible to apply for FMLA for another 4 months." *Id*. She suggested being flexible with Clevenger about working hours in order to work around scheduled appointments where feasible. *See id.* "[W]hen she's taking time off from now on," added Murphy, "she has to use all of her remaining PTO . . . We are willing to be flexible with her, but we also have a business to run." *Id.* Two days later, Murphy sent Schommer a list of suggested points to make when he met with Clevenger, including: "she will not be eligible for any job protected leave until February 1—we can revisit that closer to the timeframe." Resp. to SAF ¶ 18 (quoting email from Murphy to Schommer (Oct. 3, 2018, at 10:27 AM), Pl. Ex. 6 at 94, ECF No. 77-3).

Clevenger continued to work remotely through most of October.  *See* Resp. to SAF ¶ 20. However, drawing inferences in Clevenger's favor, Schommer monitored her closely when she worked remotely.  *See id.*  He required her to report whenever she was away from her laptop, and she sometimes used PTO to attend her husband's appointments.  *See id.*; Clevenger Dep. 182–84.

## C. Second Attempt to Cancel Remote Working Arrangement (Oct. 30–Nov. 2018)

In October 2018, Schommer again attempted to revoke Clevenger's remote work authorization, telling her that he did so because of her "VPN issues" (referring to connecting via a virtual private network) and "reports from employees and customers about not being able to reach her."  Resp. to SUMF ¶ 22–23 (undisputed).  It is undisputed that Clevenger had difficulties connecting to Castle's VPN on two occasions.  Resp. to SUMF ¶ 24.  The alleged customer complaints are the subject of numerous factual disputes.  On October 30, 2018, Murphy had a conversation with Schommer and followed up with an email message.  *See* Resp. to SAF ¶¶ 21, 27.  Murphy requested documentation of the specific complaints and, with inferences favorable to Clevenger, conveyed her expectation that Schommer would share the specifics of the complaints, including who made them, with Clevenger.  *See id.*; Murphy Dep. 36–37, Def. Ex. 3; email from Murphy to Schommer (Oct. 30, 2018, at 3:55 PM), Pl. Ex. 58 at 1478–79, ECF No. 77-17.  Murphy also asked Schommer to send her materials documenting the complaints against Clevenger.  Resp. to SAF ¶ 27.

She was required to work from the office from October 30 through November 2, 2018. Clevenger met with Gries and Schommer on November 2, 2018.  Resp. to SAF ¶ 25.  At that point, she still did not know who made the alleged complaints or what specifically was alleged. *Id.*  Later on November 2, Schommer emailed Murphy and Clevenger and advised that the customer complaints against "Clevenger were identified/conveyed over the phone."  Resp. to SAF ¶ 28 (quoting email).  Schommer further stated: "Overall, this comes down to availability when working during normal scheduled hours versus the intermittent work being performed

around external activities. The updated schedule in place will resolve both situations." Email from Schommer to Murphy (Nov. 2, 2018, at 12:57 PM), Pl. Ex. 10 at 114, ECF No. 77-7.

Following conversations with human resources personnel, Castle reinstated Clevenger's remote working arrangement on or about November 2, 2018. Resp. to SUMF ¶ 29. Castle also agreed to advance Clevenger paid time off, that is, allow her to carry a negative balance, to accommodate her need to care for her husband. Resp. to SUMF ¶¶ 30, 32.

Sometime after November 2, 2018 (the precise date is unclear), Schommer identified three email messages representing alleged complaints about Clevenger. *See* Resp. to SAF ¶ 29. The first alleged complaint about Clevenger stems from a chain of emails beginning on October 18, 2018. *See* Resp. to SAF ¶ 30–31. The second complaint came in an email message from a customer timestamped October 30, 2018, at 7:10 PM, which time is after Schommer revoked Clevenger's telework arrangement earlier that day. *See* Resp. to SAF ¶¶ 32–33. The customer inquired about a payment matter, did not receive a response for four days, and asked a sales representative for help resolving his inquiry. *See id.* Clevenger received a copy of the message, but whether she was responsible for the customer is genuinely disputed. *See id.* (citing competing evidence). The third and final complaint dated November 9, 2018, came from another Castle employee. Resp. to SAF ¶ 34. The complainant asserts that Clevenger and her co-worker, Penny Peer, engaged in excessive "chit chat" throughout the workday, and Clevenger allegedly complained about another credit representative leaving Clevenger's name in customers' voicemail boxes so that the customers would contact Clevenger rather than the co-worker. *See id*.

**D. Performance Improvement Plan and Termination (Dec. 10, 2018–Jan. 10, 2019)**

On December 10, 2018, Schommer put Clevenger on a written performance improvement plan, referred to as a "PIP" by the witnesses and parties. Resp. to SUMF ¶ 53; Resp. to SAF ¶ 37. Castle cites Schommer's testimony about reports from its Oracle database to show that Clevenger's "agings," that is past-due amounts owed by customers, had increased in October

11

and November 2018.  *See* Resp. to SUMF ¶ 54.  However, as explained in Part I.C above, the best evidence rule renders Schommer's testimony inadmissible, so a jury could reasonably find that he contrived his allegations of substandard performance.  The PIP set three goals for Clevenger to complete in one month, by January 10, 2019.  *See* PIP 2, Def. Ex. 5, ECF No. 51-5; Resp. to SUMF ¶ 60.  Most importantly, the second goal required Clevenger to reduce by three percent her "agings" due between fifteen and thirty days.  Resp. to SUMF ¶ 59.  The record does not indicate what precisely the metric used to assess this goal was, *i.e.*, whether reducing the total number of past-due accounts, the total dollar value of outstanding balances, or something else.  *See id.*; Resp. to SAF ¶ 39.  The performance improvement plan also states that Clevenger needed to "focus on prioritizing [her] daily credit collection responsibilities."  PIP 1 (alteration in Resp. to SUMF ¶ 75).

Clevenger testified that she believed that the PIP's three-percent-improvement goal was unrealistic for two reasons.  *See* Resp. to SAF ¶¶ 41, 43.  The first was that in her experience, Castle customers had become accustomed to the company using more coercive tactics to collect accounts that were sixty days past due.[2]  *See id.* ¶ 41 (citing evidence in response that in late 2018 Castle was becoming more aggressive at the thirty-day mark).  According to Clevenger, it would be difficult to collect in the fifteen to thirty-day window from customers who had become used to receiving a sixty or thirty-day grace period.  *See* Resp. to SAF ¶ 43.  Second, Clevenger testified that in her experience, Castle's customers were in the manufacturing industry, and she believed that many such companies would virtually shut down during the final week of the year, making accounts difficult to collect between Christmas and New Year's Eve.  *See* Resp. to SAF ¶ 49.  Meanwhile, Schommer testified at his deposition that he selected the three percent

_____

2. Castle objects to Clevenger's testimony on foundation grounds because she had worked for Castle for less than a year and had no personal experience from which to testify about Castle's historical practices or its customers' behavior in December.  *See* Resp. to SAF ¶¶ 41, 49, 50.  This order considers Clevenger's testimony solely to explain Clevenger's reasons for believing subjectively that the PIP's second goal was unrealistic.  Nothing in this order should be taken as implying anything about the admissibility of this testimony at trial.  *See* Fed. R. Evid. 601 (requiring testimony to be based on personal knowledge).

target because he thought it was the smallest possible change that would "show actual improvement." Resp. to SUMF ¶ 64.

Clevenger met separately with Gries and Murphy about the PIP.[3] Resp. to SAF ¶¶ 45–46. Murphy summarized their conversation in an email to Gries on which Schommer was not copied. According to Murphy's summary, Clevenger said she believed Schommer was "out to get her," she considered the timeline to be unrealistic, she had "always been told things are fine," and she felt "that the timeline is less than ideal given her eligibility to apply for FMLA within a couple of weeks of the completion of the PIP." Email from Murphy to Gries (Dec. 10, 2018, at 11:35 AM), Pl. Ex. 16 at 118, ECF No. 77-11. In her internal message, Murphy also expressed concerns about Schommer's having been "unable to provide any sound documentation [of complaints against Clevenger] that I requested." *Id.*

Castle cites Schommer's and Clevenger's depositions for the proposition that "[d]uring the PIP period, Plaintiff's agings went up and did not decrease and Plaintiff failed to meet the 3% reduction goal." Resp. to SUMF ¶ 65 (citing Schommer Dep. 152:13–24 and Clevenger Dep. 75:20–76:8). But Clevenger testified merely that she was told that her agings performed in this manner. *See* Clevenger Dep. 75:20–76:8. And Schommer testified that he consulted reports produced by Castle's Oracle software to determine that Clevenger did not meet her goals. *See* Schommer Dep. 152:13–24. This asserted fact therefore lacks evidentiary support, as the best evidence rule renders Schommer's testimony about the contents of the Oracle reports inadmissible. *See* Part I.C, *supra*. Again, a reasonable jury could conclude that Schommer fabricated his allegations that Clevenger was not meeting the PIP's three-percent-improvement goal.

On January 8, 2019, two days before the PIP's expiration date, Clevenger emailed Murphy with a retaliation complaint. Resp. to SUMF ¶ 70. The parties focus on the timing of

_____

3. Among the exhibits plaintiff cites in ¶ 45 of her statement of additional facts is plaintiff's Exhibit 15. However, Exhibit 15 has not been filed among the summary judgment exhibits. *See* ECF No. 77. Because it is not material to the summary judgment analysis and because ¶ 45 is undisputed, the court considers ¶ 45.

this and related events. Clevenger's email message to Murphy bears a timestamp of 12:46 PM. Def. Ex. 8 at 143–44, ECF No. 51-8. Among other things, Clevenger wrote that she believed she was being discriminated against because of her husband's illness, in violation of the ADA. *See id.*; Resp. to SUMF ¶ 70. There is a genuine dispute about whether Clevenger's termination letter had been drafted by the time she sent this message complaining of discrimination. *See* Resp. to SUMF ¶¶ 68–69. Metadata associated with the file of the termination letter reflects that it was created on January 8, 2019, at 8:52 AM, by another Human Resources employee named Ann Scharm. *See* Murphy Decl. ¶ 6, Def. Ex. 6, ECF No. 51-6; Termination Letter, Def. Ex. 7, ECF No. 51-7. However, the metadata also show that Murphy modified the file the next day at 8:30 AM. Def. Ex. 6 at 2. And Murphy testified that she had additional conversations about the termination decision after receiving Clevenger's email dated January 8, 2019. *See* Resp. to SUMF ¶ 67–68 and the exhibits cited in response. Resolving these genuinely disputed facts for Clevenger, a jury could find that the final decision maker, whether it was Gries or Murphy, was aware of and considered Clevenger's email dated January 8, 2019, when the final decision to terminate her was made.

Castle terminated Clevenger at a meeting on January 10, 2019, for failing to meet the goals set in the PIP. Resp. to SUMF ¶ 66. The next day, Castle terminated Schommer's employment without prior notice. Resp. to SUMF ¶ 73. The reason given was the "lack of performance in his department." *Id.* Clevenger's husband died on May 16, 2019. Resp. to SAF ¶ 16.

### III. ADA CLAIMS

Title II of the ADA forbids a "covered entity" to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The definition of "discriminate against" encompasses what is sometimes referred to as associational disability

discrimination, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C.§ 12112(b)(4); *see, e.g.*, *Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 807 (7th Cir. 2020). As construed by the Seventh Circuit, Title II limits the right to a reasonable accommodation "to disabled employees," and it "does not extend [the right to a reasonable accommodation] to a nondisabled associate of a disabled person." *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004) (citing 29 C.F.R. § 1630.8; other citations omitted). "Thus, an employee who cannot meet the attendance requirements of her job is not protected by § 12112(b)(4)." *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012)

## A. Associational Discrimination Principles

The Seventh Circuit has identified three, non-exhaustive situations in which a plaintiff may bring an associational disability discrimination claim:

> The "expense" variant arises when an employee's "[relative] has a disability that is costly to the employer because the [relative] is covered by the company's health plan." *Larimer*, 370 F.3d at 700. The second, "disability by association," occurs when an employer fears that the employee may have become infected with a disease because of the known disease of an associate of the employee. *Id.* The third, "distraction," arises when "the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation."

*Medline Indus.*, 970 F.3d at 806–07 (alterations in original). Clevenger proceeds under a distraction theory of associational disability discrimination. *See* Mem. Opp'n Mot. Summ. J. 12, ECF No. 76.

To be actionable, the distraction or interference with the employee's work must not rise to the level at which a reasonable accommodation would be required for the employee to perform satisfactorily. *Medline Indus.*, 970 F.3d at 806–07; *Larimer*, 370 F.3d at 700. The Seventh Circuit, in *Magnus v. St. Mark United Methodist Church*, quoted the following passage from the

ADA's legislative history illustrating the scope of liability for associational disability discrimination under § 12112(b)(4):

> Assume, for example that an applicant applies for a job and discloses to the employer that his or her spouse has a disability. The employer believes the applicant is qualified for the job. The employer, however, assuming without foundation that the applicant will have to miss work or frequently leave work early or both, in order to care for his or her spouse, declines to hire the individual for such reasons. Such a refusal is prohibited by [42 U.S.C. § 12112(b)(4)].
>
> In contrast, assume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the spouse. The employer need not provide any accommodation to the nondisabled employee.

*Magnus*, 688 F.3d at 337 (quoting H.R. Rep. No. 101-485, at 61–62, reprinted in 1990 U.S.C.C.A.N. 303, 343–44).

Consistent with these illustrations, the Seventh Circuit held in *Magnus* that an "employer cannot terminate the employee for unfounded assumptions about the need to care for a disabled person" with whom an employee associates. *Id*. (citations omitted). But while "termination based on assumptions regarding future absences related to a relative's care may give rise to liability, termination resulting from an employee's past absences and clear indication of future absences does not" because the employer has no duty to furnish a reasonable accommodation in the associational discrimination context. *Id*. (citing *Tyndall v. Nat'l Educ. Ctr.*, 31 F.3d 209, 214 (4th Cir. 1994)).

**B. Analysis of Associational Disability Discrimination Claim**

To prevail on her associational disability discrimination claim, Clevenger must point to evidence from which a reasonable jury could find that she "was known by [her] employer at the time to have a relative or associate with a disability [and] the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Larimer*, 370 F.3d at 701

(quoting *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir .1997); other citation omitted); *see Medline Indus.*, 970 F.3d at 807; *Magnus*, 688 F.3d at 338.  A reasonable jury could find that Castle knew by September 5, 2018, that Clevenger's husband had received a stage four pancreatic cancer diagnosis and that Castle regarded his condition as a disability.  *See* Resp. to SAF ¶ 15; email from Murphy to Schommer (Sept. 5, 2018, at 2:24 PM), Pl. Ex. 5 at 77.  There is also no dispute that Castle terminated Clevenger on January 10, 2018, termination being the paradigmatic adverse employment action.  Resp. to SUMF ¶ 66.

The dispositive question therefore becomes whether a reasonable jury could find that the disability of Clevenger's husband "was a determining factor" in Castle's decision to terminate Clevenger.  *Larimer*, 370 F.3d at 701 (quotation omitted).  In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit abolished the former distinction between the direct and indirect methods of proving employment discrimination claims at summary judgment.  834 F.3d 760, 765–66 (7th Cir. 2016).  At summary judgment all of the evidence "belongs in a single pile and must be evaluated as a whole."[4]  *Id*. at 766.  Applying *Ortiz* to an ADA claim of associational discrimination, "the single determinative inquiry is whether the plaintiff has offered evidence that . . . her association with her disabled [spouse] caused the adverse employment action she alleges," her termination.  *McNamara v. Glen Ellyn Sch. Dist. No. 41*, 2023 WL 5852180, at *3 (N.D. Ill. Sept. 11, 2023).

Castle argues that there is no evidence from which a jury could find that Clevenger was distracted at work or that Castle regarded her as distracted by her husband's illness and treatment.  Mem. Supp. Mot. Summ. J. 5–6, ECF No. 50.  As Castle argues, Clevenger testified

---

4. In her response brief, Clevenger does not utilize the modified *McDonnell Douglas* burden-shifting framework applicable to associational disability discrimination claims.  *See* ECF No. 76 at 12–13; *Magnus*, 688 F.3d at 336–37 (quoting *Larimer*, 300 F.3d at 701–02) (listing the elements of the plaintiff's prima facie case).  Before *Ortiz*, the Seventh Circuit "noted that this modified *McDonnell Douglas* test and the direct method can often be analyzed together because 'both approaches require the plaintiff to present evidence indicating it is more likely than not the employer took the adverse action because of the plaintiff's disability,'" *Magnus*, 688 F.3d at 337 (brackets omitted) (quoting *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006)).  Consistent with Clevenger's response memorandum and *Magnus*, this court analyzes all of the summary judgment evidence under *Ortiz*.

at her deposition that no one at Castle, including Schommer, made any negative comments to her about her husband's condition. *See* Resp. to SUMF ¶¶ 75–77 (citing deposition testimony). Castle also observes that it attempted to accommodate Clevenger by allowing her to work remotely and offering to allow her to maintain a negative balance of paid time off—even though it was not legally required to provide a reasonable accommodation. Mem. Supp. Mot. Summ. J. 6. Castle contends that it would not have provided these accommodations if it harbored prohibited discriminatory intent, but it cites no case creating a safe harbor for an employer who attempts to accommodate in these circumstances. *See id.*

Although Schommer did not comment verbally to Clevenger about her being distracted, a jury could find that he wrote down his concerns in her performance improvement plan when he stated that she needed to "focus on prioritizing [her] daily credit collection responsibilities." PIP 1, Def. Ex. 5, quoted in Resp. to SUMF ¶ 75. Citing a dictionary definition of the word "focus," Clevenger argues that this was "just another way of saying she was perceived as being 'inattentive.'" Mem. Opp'n Mot. Summ. J. 11. Castle argues that this goal referred to a complaint dated November 9, 2018, about Clevenger chatting excessively with a co-worker and that Schommer thought Clevenger was not managing her time effectively because she sometimes emailed reports at nine or ten o'clock at night. Def. Reply 3, ECF No. 88. Castle cites no deposition testimony or other evidence from Schommer supporting its assertions about what he meant in the PIP. *See id.* In any event, Castle's construction of the PIP's language reads it in a light favorable to Castle, which is backwards and contrary to the summary judgment standard. At summary judgment the record must be viewed in the light most favorable to Clevenger, the party resisting the motion. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007). Although the PIP's language may be somewhat opaque, the court's task at summary judgment is to analyze the entire record viewed in the light most favorable to Clevenger. *See Ortiz*, 834 F.3d at 766. The context follows.

Schommer twice tried to revoke Clevenger's remote working privileges, most recently one month before he issued the PIP. Clevenger's testimony that Schommer and Gries gradually

18

became more hostile and abrupt with her after she disclosed her husband's illness must be taken as true at summary judgment. Resp. to SAF ¶ 35. Schommer told Clevenger in an email about his second attempt to cancel her remote working arrangement: "Overall, this comes down to availability when working during normal scheduled hours versus the intermittent work being performed around external activities." Pl. Ex. 10 at 114. Schommer did not succeed in cancelling Clevenger's remote working arrangement in November 2018, but a jury could reasonably find from his email message and subsequent conduct that he continued to believe that Clevenger was insufficiently available and distracted while working remotely.

As further context, Schommer and Castle have not, as far as this record shows, produced the Oracle database reports allegedly substantiating Schommer's allegations that Clevenger was not meeting performance goals. *See* Resp. to SUMF ¶¶ 54, 65. Schommer's testimony concerning the reports' alleged contents is inadmissible at summary judgment under the best evidence rule. *See* Part I.C, *supra*. This means that a jury could reasonably find that Schommer was not telling the truth when he alleged that the reports showed that Clevenger was underperforming. *See Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 356–57 (7th Cir. 1996). Instead, a jury could reasonably conclude that Schommer, having been thwarted in his efforts to cancel remote work, continued to believe Clevenger was not focusing on her work due to her husband's illness, so he began fabricating performance problems in an effort to justify terminating her.

Considered in the context of the foregoing evidence, a reasonable jury viewing the performance improvement plan favorably to Clevenger could find that its reference to "focus" as meaning that Schommer perceived Clevenger to be inattentive to her daily credit collection responsibilities—but not so inattentive that she required an accommodation. So Schommer felt he had to contrive a performance problem to create a smokescreen to justify terminating her. There is no dispute that Castle fired Clevenger for failing to meet the goals (reflected only by the Oracle reports not in this record) set in the PIP. Resp. to SUMF ¶ 66. Accordingly, when all of the evidence is viewed cumulatively and in a light favorable to Clevenger, a genuine fact

question exists material to whether Schommer's unfounded beliefs about Clevenger's being distracted by her husband's illness was a determining factor in the decision to terminate her.

## C. ADA Retaliation Claim

The ADA makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C.A. § 12203(b). "To defeat summary judgment on a claim of retaliation under the ADA, a plaintiff must show: (1) statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024) (citing *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 856 (7th Cir. 2023)).

Castle argues that Clevenger cannot establish a causal connection between her protected activity—her email to Murphy dated January 8, 2019, in which she complained that she was being discriminated against in violation of the ADA—and her termination two days later because: (1) the events setting her termination in motion (the PIP) occurred before January 8, 2019; (2) by the time she sent her complaint email, she knew that she would not meet the goals set in the PIP; and (3) there is allegedly no dispute that she failed to meet those goals. *See* Mem. Supp. Mot. Summ. J. 6–7.

Castle's first and third arguments improperly resolve genuine factual disputes in its favor. Specifically, as previously explained, there is a genuine dispute of material fact as to whether Schommer fabricated the alleged Oracle reports in order to initiate the PIP process and manufacture grounds for terminating Clevenger. Regarding Castle's arguments that the PIP had set the termination process in motion and that Clevenger knew she would be terminated on January 8, 2019, the evidence shows only that Clevenger believed she would be terminated based on what Schommer told her about her fifteen-to-thirty-day aging reports. *See* Clevenger

20

Dep. 252, cited in Resp. to SUMF ¶ 71.  There is ample evidence, including the January 8, 2019, email itself, supporting the conclusion that Clevenger regarded Schommer's claims to be a contrivance intended as a pretext for prohibited discrimination.  Clevenger did not concede that the alleged Oracle reports existed or showed what Schommer claims they showed.  *See id.*

In addition, the record includes evidence from which a jury could find that Murphy consciously disregarded concerns about the bona fides of the PIP.  In an email sent after she learned of the PIP, Murphy expressed frustration that Schommer had been unable to provide "sound documentation" of complaints against Clevenger despite repeated requests, yet Castle ultimately decided to terminate her anyway.  *See* email from Murphy to Gries (Dec. 10, 2018, at 11:35 AM), Pl. Ex. 16 at 118.  In addition, depending on how it resolves genuinely disputed facts, a jury could find that Murphy or Gries made the decision to terminate Clevenger only after receiving her January 8, 2019, email complaint.  *See* Resp. to SUMF ¶¶ 68–69.

Recapping then, the summary judgment record contains two types of evidence supporting Clevenger's causation theory: (1) evidence of suspicious timing, a decision to terminate made within two days of her engaging in protected activity; and (2) evidence that the basis for Clevenger's termination, her alleged failure to meet performance goals, was pretextual.  Seventh Circuit "cases reject any bright-line numeric rule, but when there is corroborating evidence of retaliatory motive, as there is here, an interval of a few weeks or even months may provide probative evidence of the required causal nexus."  *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012) (collecting and discussing cases).  The Seventh Circuit has found "evidence of causation sufficient to withstand summary judgment where adverse actions against an employee commenced one month after she had filed complaints of . . . discrimination, where the employee had also presented evidence of pretext."  *Rowlands v. United Parcel Serv. - Ft. Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (quoting *Anderson v. Donahoe*, 699 F.3d 989, 996 (7th Cir. 2012)).  When the summary judgment evidence is viewed in the light most favorable to Clevenger, the evidence of pretext plus the highly suspicious timing of her termination—shorter than the one

month interval in *Rowlands* and *Anderson*—raise genuine fact issues for a trial on the causation element of Clevenger's ADA retaliation claim.[5]

## IV. FMLA CLAIMS

"The FMLA generally provides eligible employees suffering from a serious medical condition with as many as twelve weeks of unpaid leave during any twelve-month period." *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) (citing 29 U.S.C. § 2612(a)(1)(D)). Clevenger brings an FMLA retaliation claim, 29 U.S.C. § 2615(a)(1), and an interference claim, 29 U.S.C. § 2615(a)(2), that is, a claim that Castle interfered with her FMLA rights. These are distinct claims. *See id.* (citing *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). "To prevail on a claim for retaliation in violation of the FMLA, a plaintiff must show that (1) he engaged in FMLA-protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the two." *Juday v. FCA US LLC*, 57 F.4th 591, 596 (7th Cir. 2023) (citing *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015)). In contrast with Clevenger's FMLA interference claim, her FMLA retaliation claim "requires proof of discriminatory intent—evidence that the employer 'was acting under a prohibited animus.'" *Id.* (quoting *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009)). For purposes of the FMLA, an "eligible employee" is an employee who has worked for the employer for at least one year and for at least 1,250 hours during the year preceding the requested leave. 29 U.S.C. § 2611(2)(A).

Castle first argues that *Basden v. Professional Transportation, Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013), requires entry of judgment as a matter of law because Clevenger had not reached her one-year employment anniversary and become eligible for FMLA leave on the date she was terminated. Mem. Supp. Mot. Summ. J. 8–9. In *Basden*, the Seventh Circuit considered whether

---

5. Plaintiff also argues that she engaged in protected activity prior to January 8, 2019, when she complained of being "singled out" and that Schommer was "out to get her." Mem. Opp'n Mot. Summ. J. 15. Having ruled that a fact issue exists concerning Clevenger's January 8, 2019, email, the court need not determine whether Clevenger's earlier complaints constituted engaging in protected activity.

the FMLA afforded protection to a plaintiff who, "before she was eligible for FMLA protection, sought leave that would have commenced before her eligibility began." 714 F.3d at 1039. The Seventh Circuit construed the FMLA this way: "According to the statute's explicit terms, employees without 12 months of tenure are ineligible for its protection." *Id.* (citing 29 U.S.C. § 2611(2)(A)(i)). The *Basden* court therefore held, "There can be no doubt that the request— made by an ineligible employee for leave that would begin when she would still have been ineligible—is not protected by the FMLA." *Id.* (quoting *Walker v. Elmore Cnty. Bd. of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004)). Thus, the facts and holding of *Basden* do not cover the precise situation presented here because Clevenger contends that her FMLA leave would have commenced after, not before, she became eligible. District courts applying *Basden* have drawn just such a distinction, holding that the FMLA affords an employee protection if, prior to becoming FMLA eligible, the employee "put [her employer] on notice that she was requesting leave to be taken once she became eligible" for FMLA leave. *Jones v. Metro. Water Reclamation Dist. of Greater Chi.*, 2018 WL 1508529, at *4 (N.D. Ill. Mar. 27, 2018) (citations omitted); *accord Brown v. Pitt Ohio Exp., LLC*, 2013 WL 5221483, at *2 (N.D. Ill. Sept. 16, 2013) (distinguishing *Reynolds v. Inter–Indus. Conf. on Auto Collision Repair*, 594 F. Supp. 2d 925 (N.D. Ill. 2009)).

Although the district court cases cited above appear well-reasoned, this court need not adopt their reasoning today because the record does not permit a finding that Clevenger put her employer on notice that she was requesting FMLA leave once she became eligible. Clevenger cites no evidence showing that she made such a request. *See* Mem. Opp'n Mot. Summ. J. 4. Rather, as she characterizes her testimony, she "did not want to take 'unpaid' time off until absolutely necessary because she was the sole support for the family, and she was concerned about finances." *Id.* (citing Resp. to SUMF ¶¶ 27, 31, 35, 37). The summary judgment record supports this characterization of Clevenger's testimony. It is undisputed that, due to her husband's prognosis, Clevenger did not know by January 3, 2019, whether she intended to request FMLA leave in February or whether her husband would have any treatment scheduled in

February, when she would become FMLA eligible. *See* Resp. to SUMF ¶¶ 13–17. Neither does Clevenger point to any evidence that she communicated an intent to take FMLA leave after January 3, 2019. *See* Mem. Opp'n Mot. Summ. J. 4.

In key respects, the facts here resemble those on which the Seventh Circuit affirmed summary judgment in *Nicholson v. Pulte Homes Corp.*:

> Nicholson [the plaintiff] told Wilhelm [one of her supervisors] in December 2008 about her father's cancer diagnosis and said that she might need time off in the first quarter of 2009 due to her father's possible need for chemotherapy. Nicholson herself characterized the matter as "open-ended" because of the uncertainties surrounding her father's need for treatment. After that Nicholson asked for, and was granted, one day off in April 2009 to attend a medical appointment with her father. She later told Wilhelm that her father's diagnosis had worsened to stage III cancer, but did not mention a possible need for additional time off. Thus, while Wilhelm was alerted to the seriousness of Nicholson's father's health condition, she was not on notice that Nicholson needed medical leave to care for him.
>
> \* \* \* \*
>
> . . . Thereafter, on just one occasion, she asked for—and was granted—a day off to attend a doctor's appointment with him. There were no leave requests pending when Naatz and Wilhelm decided to terminate Nicholson's employment. Nicholson's conversations with Wilhelm were too indefinite to put [her employer] on FMLA inquiry notice.

690 F.3d 819, 827 (7th Cir. 2012) (emphasis in original).

In the present case, Clevenger points to no evidence that a leave request was pending when she was terminated. The uncontested evidence shows that she had communicated that her husband's anticipated future treatment in February 2019 was unknown and open-ended. *See* Resp. to SUMF ¶¶ 13–17. On October 31, 2018, Clevenger even told Murphy in an email message: "[I]f I cannot work and earn my full pay I am going to crumble." Email from Clevenger to Murphy (Oct. 31, 2018, at 4:14 PM), Pl. Ex. 7 at 95, ECF No. 77-4. Even taken in the light most favorable to Clevenger, this evidence, like the evidence in *Nicholson*, did not provide Castle with adequate notice that Clevenger was requesting FMLA leave or intended to do so once she became eligible in February. *See also Metro. Water Reclamation Dist. of Greater*

24

*Chi.*, 2018 WL 1508529, at *4. Therefore, as was the result in *Nicholson*, Clevenger's FMLA claims are dismissed at summary judgment.

## V. CONCLUSION

For the reasons stated, defendant A.M. Castle & Co.'s motion for summary judgment is granted in part and denied in part. Plaintiff's claims under the Family and Medical Leave Act are dismissed, and summary judgment is granted in favor of defendant. Defendant's motion for summary judgment on plaintiff's claims under the Americans with Disabilities Act is denied.

Date: March 31, 2025                                   /s/ Joan B. Gottschall
                                                       United States District Judge